Good morning, your honors. Quinn Dunder, federal defender from Sacramento, representing Ms. Thomas. The issue before the court is whether the district court erred in denouncing Mr. Thomas. The motion to suppress the evidence and the standard of review is de novo reviewed by this court. There were 10, since we only have 10 minutes, there are 10 factors that were cited by the officer as a reason for prolonging this detention of Ms. Thomas for 7 to 10 minutes after she had been stopped for following too closely and had produced a valid driver's license. I've prepared a little chart which just lists those, it may make it easier. But as to 8 of those, the district court dismissed those and did not rely on them, essentially saying that they were so innocuous they could not really support a reasonable suspicion of drug trafficking. Instead, the district court seized upon 2 of those and concluded after analyzing those 2 that it was a very close case, but that the evidence would not be suppressed. You know, I've got a related but somewhat different question. Our standard, because of the Supreme Court case of, and I'm pronouncing it right, Brignone-Ponce, is that questioning is allowed only if it's reasonably related in scope to the purpose of the stop. But what do we do in this case with what I view as Judge Carlton's finding that almost from the get-go that he was not questioning related to the purpose of the stop. He was questioning as part of a narcotics investigation. Does that make his questioning that the district court found was pursuant to a narcotics investigation rather than to the purpose of the stop invalid under Brignone-Ponce? Yes, Your Honor, that was our initial position with the court, that once she was stopped, she produced a valid driver's license. She produced what appeared to be a valid registration and insurance. He did not check those. He had no question about those, which I'll distinguish this case from Barron and I'll explain that. That at that point, he had to either cite her or let her go. Instead, he went off onto this. I'm not sure that's right, because we allow a fair range of questioning, whether we should or not. I think we do. But we have a district court finding that his purpose was not to investigate the traffic stop, but rather to investigate narcotics. That's correct, Your Honor. And I think that's his control. Mr. Denver, in light of Wren v. the United States, we don't care anymore whether the stop is pretextual as far as the Supreme Court is concerned. I don't think it's what his motive was. It was the nature of the questioning that he asked. I think that's what Judge Carlton was saying, that these questions were directed at drug trafficking, not at the reason for stopping. But even if that's the case, we've certainly allowed officers some leeway when there is a reason to ask the questions. And Judge Carlton did look at the three multistate connections that were obviously apparent when she started producing a driver's license from one state, a notice of transfer from a third state, and welfare benefit cards from yet another state. That's correct, Your Honor. And what's wrong with questioning her about, you know, what are you up to here? Well, I think, first of all, I'm not sure what is suspicious about that. She explained that she lived in Washington, that her children lived in Orange Cove, California, and she was moving to Oregon. I mean, I don't think that that is something that raises some – I have to accept her answer. I mean, I understand that's what she said, but that evidence is also susceptible, is it not, to another more sinister implication, which is that there may be criminal activity. I don't believe that's correct, Your Honor. I don't see the fact that you have these innocuous connections to different states leads to some suspicion that you're in drug trafficking. But if we're looking at this under a totality of the circumstances approach, and I understand why you would prefer the divide-and-conquer approach, but I think the law says we have to look at all of the factors, are you asking us to rule as a matter of law that it was impermissible for him to ask questions with regard to clearing up the suspicion in his mind that she might be involved in some nefarious behavior based on – Yes, Your Honor, because I think what he cited to support – the problem is, of course, that he detained her for this long period beyond what was necessary for the stop. Well, as I understand it, the detention was basically limited to enough time to say, would you mind if I search your car, once he had terminated the traffic enforcement reason for the stop. The question, though, is the prolongation before that, and then the consent is tainted by that under Chavez Valenzuela. If that detention for 7 to 10 minutes was improper, then the consent was improper. It's tainted by that. I believe that Ninth Circuit has made that clear. But haven't we said – I mean, you know, we've got the opinion in Murillo, we've got Perez. I mean, haven't we said that if the officer can articulate reasons for his suspicion that we have to give some deference to a trained police officer who is supposed to be doing more than simply writing tickets for following him? Well, Your Honor, you've also said in Sigmund Ballesteros, we must not accept what has come to appear to be a prefabricated or recycled profile of suspicious behavior, very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on a hunch. But we don't want to develop policies that tell police officers to ignore evidence of potential crime, do we? If there is evidence. But let's just take the two points that the judge – I think we have to look at all ten, don't we? Excuse me? Don't we have to look at all ten under the terminology? I think we have to look at all ten. But, I mean, some of them make no sense at all. The fast food wrappers. I mean, there's nothing to that at all. The fact she had an unusually clean car by Officer Stallman's standards, that says nothing about it. Clean or messy? I mean, how can she have an unusually clean car if she's got fast food wrappers on her? Well, there was that question. But how does that link to – an unusually clean car linked to drug trafficking? I mean, all of this is supposed to point to a suspicion, a reasonable suspicion, of drug trafficking. And one of the points I want to make, because I think this is important, is on this vehicle ownership. She said that she had gotten the car from a fellow by the name of Ruben, who was a friend of her cousin. She gave the cousin's name, though the officer didn't write it down, and she explained that's how she received it. That was confirmed by the fact that the name on both the registration and the insurance was Ruben Gonzalez-Vazquez. Now, that is not suspicious. I mean, if there's anything suspicious about it, it would have been that maybe there was an auto theft involved. But how does that link in any way to drug trafficking? And I want to say this. One of the cases that the government has said is controlling here is the Barron case. And I've been troubled by that case. We try to distinguish that in the reply brief. But I read it again, and I finally figured out what that case is all about. That was a case where the defendant could not name the owner, there was no registration, and there was no insurance card. And here's what happened then. This is in the first page. Suspecting that the vehicle might be stolen, Officer Hussican radioed in for a check on the vehicle's registration and title. While waiting for a response, Hussican continued talking to Barron. And then it says, Soon thereafter, Hussican received negative registration license checks indicating the car was not stolen and that the license was valid. She asked one more question, said she wasn't going to cite him. Then he said, Are you involved in contraband? And sought the search. So there was a reason there for the detention, which was to check out this question as to whether it was possible auto theft. That was not the basis on which there was no such check that was done in this case by Officer Stallman. So I think that that really distinguishes Barron. There is a reasonable suspicion in that basis of auto theft. She could make that check. She checked it, asked one question, and then moved on. I think it was proper for the highway patrolman to make inquiry as to what state are you really living in, in the face of all of these indicia of contacts with three states. But this detention takes seven to ten minutes. He holds her there for all that time. When she answers the questions, there's nothing suspicious about where she's. . . I mean, the fact that she lives in different states, how does that link? How doesn't that sweep in a whole bunch of innocent people? It doesn't point to drug trafficking. The fact of the vehicle ownership, that she borrowed the car from a friend of her cousin. She gave the cousin's name. Why does a borrowed car indicate that there's drug trafficking? I mean, you have to remember, this officer said it. He has a mini profile of people, and he goes out and asks questions, looking. . . Everybody he stops he thinks is a suspected drug trafficker. And he asks them questions. And sometimes he's right. I'm sorry? And sometimes he's right. And sometimes he's right, but more often he's wrong. More often he's wrong. Well, sure. But he was right in this case. No, but he was right in this case. But we can't judge it on that basis. I mean, the Court has made clear that you can't take these innocuous factors that sweep up all these innocent people in so that you can keep, as they say, you keep kissing those frogs until you catch their prince. So that's what they do in this case. Didn't the Supreme Court tell us in the case, I can't remember the name, but it was the border drug case that they reversed us on where we had ten different factors and our panel had gone through and we strike factor one, we strike factor two, and we got pretty soundly slapped down by the Supreme Court saying, we really mean totality of the surface. I think that what they said is you look at each of them individually, then you look at them in totality. And I think that just the fact that he can cite ten factors, some of which, one of them, the fact that she had a suitcase, he admitted was contrary to his profile because most of the drug couriers traveled very lightly with either no clothes or something in an overnight bag. That even cut the other way. But what he does is he has this mini profile. He said he had that. And part of it's based on what he would do. He thought the vehicle mileage was high because it was high from what he thought it should be. He thought it was an unusually clean car because his car was much dirtier. You can't have an officer who just comes up there and is allowed to ask as many questions as he wants, finds anything that he can say, well, that sounds a little suspicious, and then try to link it to drug trafficking. But ultimately it was enough to convince Judge Carlton who denied your motion. That's why we're here. He said it was a very close case. He singled out two points, and I think that he did not, and we did not focus him on the vehicle ownership question as far as Barron was concerned. That there was, if this raises suspicion of anything, it was auto theft. But he did not detain her in order to investigate that. He accepted there was an auto theft here. And so he started looking for these frogs to kiss, as he calls it. Okay. Thank you. We'll give you a minute in response. Thank you. May it please the Court. I'm Ken Malikian. I'm Assistant United States Attorney in Sacramento, of course representing the United States. Your Honors, in Fourth Amendment cases, I submit that one of the most important functions of this Court is to provide guidance to police officers so that their subsequent conduct can be consistent with the dictates of the Fourth Amendment. And we're facing a situation where back in June of 1998, Officer Stallman stopped the tailgater. He asked questions, and this Court had held prior to that time in Perez and Barron, that questions asked during an investigative traffic stop have to be reasonably related to the scope of the justification for that stop. And that an officer can broaden his line of questioning only if he notices additional suspicious factors, which are particular lies. How many questions did he ask about following too closely? He didn't ask very many questions about following too closely, Your Honor. He asked a number of questions. Did he ask any questions about following too closely? I think the record indicates that he indicated that she was following too closely, and that's it. I don't recall if there were any further questions. Well, no. You said further questions. I asked were there any questions. And you said the record indicates he gave a citation. You didn't tell me the record indicates he asked a question. No, no. I'm sorry. He did not give a citation, Your Honor. He indicated she was following too closely. He gave a warning. But I don't believe he asked any questions. Okay. What he focused on was the driver license status of Ms. Thomas. She, pursuant to Vehicle Code Section 12500, has to be a licensed driver in this state or some other state. And if she is a resident of California, a Washington license would not be valid, and that would not be a validly recognized license in the state of California. His traffic enforcement quickly changed from that of tailgating to do we have an unlicensed driver. I do want to point out that after the approximately seven, perhaps up to ten minutes, of investigating the traffic issues, the officer indicated he was not going to issue a citation and gave her a warning. What do we do? I'm looking at the ‑‑ I'm having trouble pronouncing it, Brignone Ponce, which is quoting language from Terry. And the Terry language which was quoted and then the foundation for the holding in Brignone Ponce is, as in Terry, the stop and inquiry must be, quote, reasonably related in scope to the justification for their initiation. I've got the following problem with this case, and it's an odd problem the way it shows up. Some questions under our holdings, including under Barron, even though, in fact, they stray from, let me see your driver's license and registration. And even though they stray from your questions about following to a close, we allow such questions. And those are reasonably related. You can even ‑‑ under our case laws, I see it, the police officer gets to ask, well, where are you going? Where are you coming from? And it's just sort of odd little questions. Because I guess we think that those are at least conceivably reasonably related to the scope of the justification for the stop. But what if, as here, we have a finding by the district court that that was not the purpose of the questions? That from the get‑go, says the district court, these were questions not related to the purpose of the stop, which was following to a close. These were questions that were part of a drug investigation. So we know from the finding of the district court that they were not reasonably related in the sense of what the officer's motivation was. What do I do with that? Your Honor, I think the Wren case dictates there. These questions ‑‑ I'm sorry, the Wren case is reasons for the stop. Wren case does not talk about questioning after the stop. That's correct. But the district court also found that these questions could be legitimately asked and were also relevant to a routine traffic investigation. Well, you see, that's my question. Could be legitimately asked if the officer's motivation was, I'm trying to figure out things related to the stop. What about when we know that the officer's motivation was not that, but was rather, I'm investigating a drug stop from the moment I stopped this person? Your Honor, I believe that the officer's subjective intent would not be relevant as long as his line of questioning, as long as the detention is consistent with that which he can do. I would submit to the ‑‑ It doesn't matter that he was, in fact, questioning her because he thought she might be doing drugs. Well, while he was doing that, he was also questioning her with regards to her driver's license status, with regards to her residency. It was a contemporaneous investigation. Well, no. He makes it pretty clear in his testimony, and Judge Carlton makes it pretty clear in his finding, that the reason he was asking these questions was this was, in his mind, a drug investigation. Now, if this had not been a drug investigation, some of those questions, I think without question under our case law, would be permissible questions. My issue is, well, what if we know that he's not asking these because they're within the permissible scope? That's not his motivation to find out about the stop. His motivation is, I want to see if she's doing drugs. Your Honor, my recollection of Judge Carlton's findings are that he indicated that he believed that from the get‑go, this officer was interested in every traffic stop as to whether or not there may be drugs involved, drugs being transported. But I don't believe Judge Carlton ever concluded that that was the sole purpose for the questioning. I don't believe that was ever a finding that Judge Carlton made. Judge Carlton did indicate that he thought that that was one of the officer's purposes, but I don't believe he indicated that was the sole purpose. Well, I'll read to you from Judge Carlton. He says, It appears to me that almost from the get‑go, and I don't say this as a criticism, not intended as that, Officer Stallman was investigating a drug offense. He was never investigating. He never really did anything concerning the stop because the stop was self‑evident. Either she was too close or was she not? So from the very beginning he's inquiring, it appears to me, it appears to me he's actually undertaking a narcotics investigation. That's Judge Carlton. Yes, but Judge Carlton never indicated that the questions weren't legitimate in the scope of trying to ascertain her residency. If she lived in California, if she lived in Oregon, she had an invalid license. And your position is it doesn't matter why the officer wanted to know that? Correct. Okay. But let me ‑‑ I think you'd extend Ren from the reason for the stop to reasons for the questioning post‑stop. Your Honor, let me elaborate. It is the government's position that while Judge Carlton made that finding at the conclusion of the hearing, there was no adverse finding that there was not an investigation for the residency and the driver's license status of Ms. Thomas. And it is the government's position that as long as there is a legitimate investigation and there's no finding that there wasn't, that there can be dual investigations. And that's the government's position. It's been a while since I've read Ren, but isn't that the case where the police suspected drug activity but stopped the car for a traffic violation and then contacted the driver hoping that they might see in plain view or from whatever further contact they would have with the driver evidence of narcotics? I'm sorry, Your Honor, which case was that? Ren. Isn't that the facts in Ren? Yes. Yes. Basically, it was a pretext stop. Right. In Ren. But, I mean, I guess my question is why should we restrict Ren to simply the initial stop? I mean, clearly the Supreme Court was presented with a case where the officers had a different reason but seized upon the traffic violation as the way to get Mr. Ren pulled over. And then presumably when they were contacting Mr. Ren about the traffic violation, they obviously were looking for something more serious than whatever the infraction was. Your Honor is correct. If the traffic stop was a pretext stop, obviously their investigation was a pretext investigation. I don't think Ren should be restricted. Well, let's accept it for purposes of this next question, that Ren applies to questions you can ask, like let's see your driver's license, let's see the registration. Why is the driver's license? What's your residence? And he gets answers to that. And then there's, what, five minutes after that or what? Your Honor, I don't think. When do the questions that he really can ask stop? And why keep her after that? I don't think there's anything in the record to indicate there are any questions that were impermissible until he said I'm going to issue a warning, not a citation. And I'm concerned that you may be transporting drugs. Do you have any drugs and may I search your car? I don't think there's anything in the record to indicate in those seven to ten minutes there was anything asked that pertained to drugs whatsoever. How long does it take to ask where's your driver's license, where's the registration, and where do you live? Well, Your Honor, I think that at the traffic stop you had the lady producing these documents. You had questions that followed upon the production of these documents. You had three different states providing these three different documents. And you had legitimate questions. Okay, where do you live? Are you actually a resident of Washington, which has issued your driver's license? Why are you not a resident of California where you have social services cards? And he asked how many residences do you have. She said she had a couple and was getting a third in Oregon. And how is that related to following too closely? It's not, Your Honor. It's related to a vehicle code section 12500, being a licensed driver. If her Washington driver's license was issued but she is no longer a resident of the state of Washington, it's not a valid license. It's not recognized in Washington. It's not recognized in California. Isn't there a grace period? I don't know. Yes, there is. Having previously been a Washington state licensed driver and then having moved to California, yes. And, Your Honor, even if there's a grace period, that provides more questions for the officer to ask. When did you leave? Has the grace period expired? So I think, if anything, that would necessitate further questioning perhaps. But suffice it to say. But that means any time the officer looks at a driver's license, he is allowed to ask, well, where do you live? Because he needs to find out, is it potentially a valid driver's license? If he sees a California driver's license, he says, do you live in this state? Well, Your Honor. Isn't that right? Doesn't that follow from what you just said? I don't think it necessarily follows. If someone's driving in California and produces a California driver's license, I've been asked when I've been stopped, is this your current address? But that's been it. And surprisingly enough, I had recently moved and he corrected her on my driver's license. But I don't think that that's a question that should necessarily follow, no. But when you have a registration and a license. And how uncommon is it for somebody to be driving in on I-5 with a Washington State driver's license? Oh, I'm sure there are plenty of people driving with Washington. I can almost guarantee you there are very, very few with Washington licenses, Oregon registration, and California social services cards. There just aren't many of those. And that's what peaked his suspicion. That would cause him to think that perhaps this lady might be a resident of Oregon or California. She, in fact, said she had a residence in California. She, in fact, said she was moving to Oregon. And he pursued that line of questioning, Your Honor. Okay. Thank you very much. Thank you. Excuse me. Two points I'd like to make. I think Judge Canby really put his finger on this, which is it is the length of the detention. It is the seven to ten minutes that is the constitutional violation. The question is. That's unreasonable under the Fourth Amendment if the officer had a legitimate reason for making the stop? Well, I think it is for a traffic stop, Your Honor. And then the second point I was going to make. It's more than that. I mean, I would agree with you if it was just limited to following too closely. But now he's got some indication that there may be a problem with regard to the registration or licensing status of the driver. But, Your Honor, California law, California code, vehicle code section 12801.5, subsection E, specifically says that an officer cannot detain a person solely on the belief that the person is an unlicensed driver unless he has reasonable cause to believe the person is under 16. If you can't detain them, then you can't use that as the sole basis for extending a detention. Even if he has otherwise lawfully stopped her for following too closely and he has presented with evidence that she may not be properly licensed, he can't conduct questioning? I don't think he can extend the detention based on the concerns of an unlicensed driver. If he cannot detain her on that basis, if he should have been released based on the traffic stop within a minute, then he cannot spend another six minutes investigating an unlicensed driver and say I'm doing that. But under State law, he's not allowed to detain a person for just investigating that. Besides the citation to the CVC section, do you have a case that you can cite that says that? Because that sounds counterintuitive to me. Well, Your Honor, I don't think it's counterintuitive. I don't see how it's counterintuitive. What if he stops the person and then he finds out that everything he wants to know about is following too closely? And then he says, well, I'm just going to detain you to investigate for two hours on whether you're a licensed driver. I think that violates that section. I don't think he can do that. What if the driver can't produce a certificate of insurance, proof of insurance? Is he allowed to continue the inquiry to decide whether or not this is an insured driver? Well, Your Honor, but in this case, she provided the insurance. She provided registration. She provided a driver's license. He had no questions about that. He didn't check any of those. He didn't say, well ---- But I guess my question for you is you seem to be asking us to adopt a rule that says if the officer is presented with evidence of a different violation of the vehicle code, he cannot detain her any longer in order to conduct an inquiry into that particular violation. And that just strikes me as being a very odd rule. I don't think he can detain her for 7 to 10 minutes. I think all these cases say that there are not bright-line rules. These are totality of circumstances, very fact-intensive cases. And the question is reasonableness under the Fourth Amendment. And it's reasonableness. And what it really is is articulable facts that raise a reasonable suspicion of drug trafficking, not just his hunches, his guesses, his kissing a lot of frogs. What are reasonable facts that raise a suspicion that she may not be properly licensed to drive on the highway? Well, there's nothing ---- He doesn't investigate that. He has three questions. He doesn't check out whether any of these are valid documents. He doesn't do anything to do that at all. He doesn't check to see if when you worry about who owns the car, he doesn't check to see if it's an auto theft. He detains her. He walks around. He looks at the van. He asks her to produce some documents out of her ---- the children's benefits cards out of her wallet. I don't know what he does, but for 7 minutes he holds her there. And then he finally says, well, I'm not going to cite you, but do you have drugs in there and can I search there? You know, I think that falls into it. For your honesty, was anything made of the following too closely? How closely was she following and how closely can you follow? We can see he testified, and we're presenting nothing different, that she was ---- he said she was 20 feet behind at 70 miles an hour. And when she was asked and told that she was following too closely in answer to Judge Fletcher's question, she said, I was. So, I mean, she's like, okay, you got me. I did it. So it's like ---- Every freeway is filled with thousands and thousands of cars following too closely. I think that's true. But I think under Wren, the fact that he's stopping her for other reasons is ---- Why didn't he stop the leading car for traveling too slowly in the fast lane? I think it was going 70, Your Honor. Maybe in California that's not in the fast lane. Well, no. The California Motor Vehicle Code says if you're blocking traffic in the left-hand lane, move over. Well, he ---- Why didn't he stop that guy? He didn't think that was a frog to be kissed, I think. I'm wondering, okay, well, what ---- How's he picking ---- He delayed an improper lane change. Yeah, that's right. How's he picking his frogs? I don't know, Your Honor. Okay. A Native American woman driving alone, I don't know, following closely, I don't know what the basis is. Thank you, Mr. Baird. Thank you, both counsel. An interesting case, an interesting argument. The United States v. Thomas is now submitted.
judges: Canby, W. Fletcher, Tallman